UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEREMY SCOTT JOHNSON, | No. C 09-3946 SI (pr) |
| Plaintiff, | **ORDER GRANTING MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| 0GILROY P.D. OFFICERS JESUS CORTES; et al., | |
| Defendants. / | |

## INTRODUCTION

In this civil rights action under 42 U.S.C. §1983, Jeremy Scott Johnson complains that he was subjected to excessive force during the course of his arrest by officers from the Gilroy Police Department. For the reasons discussed below, defendants' unopposed motion for summary judgment will be granted and judgment will be entered against plaintiff.

## BACKGROUND

In his verified complaint, Johnson alleged that he had been subjected to excessive force during his arrest on March 27, 2009 by six members of the Gilroy police department: Jesus Cortez, Diana Mora, Geoffrey Guerin, Joseph Deras, Justin Matsuhara, and Rene Arbizu.

The following facts are undisputed, unless otherwise noted:

Johnson was arrested after 11:30 p.m. on March 27, 2009.

Johnson stated in his verified complaint that, when he was arrested, the officers "cuffed me, then assualted (sic) me for 20 minutes, 30 second, in handcuffs. Had broken ankle, and fatal

infection in blood M.R.S.A. Was assaulted by all six officers stated above." Complaint, p. 4. He also alleged that he broke his right ankle, had bone spurs, had dislocated his left wrist, was punched, had bit his tongue, and had abrasions on his face. Id.

Johnson is about 6'4" tall and weighs about 255-260 pounds. He has been diagnosed with bipolar disorder, ADHD, and oppositional defiance disorder. He takes medications for his mental health problems, but did not take his medication for his bipolar disorder on the day of his arrest. He smoked marijuana and crack cocaine that day.

On the night of his arrest, Johnson and his wife, Wanda, went to a National Guard Armory in Gilroy that was functioning as a homeless shelter. At the Armory, Johnson went to the bathroom, purportedly to take a shower. Wanda eventually became concerned about the time he was taking and went into the bathroom, where she accused him of smoking crack cocaine rather than taking a shower. The staff at the shelter responded to the commotion and, after becoming aware of an accusation that Johnson was smoking crack cocaine in the bathroom, informed Wanda that they were going to call the police. Johnson denied smoking crack cocaine in the bathroom, but admitted that Wanda accused him of taking drugs during an argument. When the staff said that police would be summoned, Wanda left and Johnson rushed out of the bathroom after her.

Marie Vasquez, who worked at the Armory, perceived Johnson to be very "very rude and very loud," intimidating, and apparently "under the influence of something." Docket # 12, at p. 62 (unpaginated Vasquez Deposition).

At 11:41 p.m., Gilroy police officers Cortez and Mora were dispatched to the Armory for a report of a verbal disturbance between a man and woman. Officer Cortez approached Johnson as he was standing on the sidewalk in front of the Armory. Johnson appeared agitated to officer Cortez and to bystander Marie Vasquez. Johnston complied with Cortez's request to be seated. Johnson was visibly irritated because Cortez directed him not to smoke. Officer Mora, who was talking separately with Wanda, advised Cortez that there had been only an argument. Cortez then initially told Johnson that he could leave the area.

Officer Cortez then was advised by the Gilroy police department communications office

that Johnson was on parole with special parole conditions, one of which was that he could not have contact with Wanda without permission from his parole officer. Johnson knew of this special condition, had not sought or obtained permission for contact, and knew he was in violation of his parole.

Cortez informed Johnson that he was being arrested. Johnson argued with Cortez. Johnson was handcuffed after being pushed up against the officer's vehicle, a police S.U.V. The parties dispute whether his hand was pinned so that he couldn't voluntarily present it for cuffing, or whether he refused to present it. Johnson was told several times to get into the patrol vehicle and did not do so and instead yelled insults, telling the officers, "'fuck you pigs. You piece of shit pigs. I'm not going to jail.'" Mora Decl., ¶ 5.

Cortez then pushed Johnson backwards into the back seat area of the vehicle. Johnson landed partially on the floorboard of the back compartment of the vehicle, with his legs and feet outside the door. Cortez instructed him again to get in the vehicle. Johnson refused and resisted by thrashing around, so Cortez administered a chin thrust to push him further into the vehicle. Officer Mora went to the left side of the vehicle where she attempted to pull Johnson into the vehicle while Cortez pushed from the other side. Officer Mora "observed [Johnson] kicking his feet wildly in an attempt to kick Cortez." Id. at ¶ 6. Mora struck Johnson four times with "distraction strikes" to his left cheek area to get him to stop kicking at Cortez and to distract him so that Cortez could close the door to the vehicle. Id. One of her strikes hit Johnson in the mouth when he turned his face toward her. That strike injured Johnson's mouth. Johnson continued to thrash about and curse. Mora believed that, if Johnson had the opportunity to get out of the vehicle or if the officers were unable to control him, he would have tried to hurt the officers. Officer Cortez, who was at the foot end of the kicking arrestee, was concerned that Johnson might kick him in the groin and disable him, and possibly overtake officer Mora (who was a foot shorter and more than a hundred pounds lighter than Johnson). Officer Cortez also applied a distraction strike to Johnson. Officer Mora radioed for emergency assistance.

Officer Arbizu arrived on the scene and entered the patrol vehicle on the left side. He showed Johnson the electrical current running in the taser, and told Johnson that he would be tased if he did not follow directions. Johnson immediately complied by drawing his feet into the

3

vehicle. The doors were then closed, leaving Johnson as the sole occupant in the vehicle. "Once in the backseat of [the] patrol vehicle, Plaintiff began to scream and forcefully kick the right rear passenger side security bars covering the window. Plaintiff kicked the passenger side window approximately four times." Cortez Decl., ¶ 19. Officer Cortez was concerned that the barefoot Johnson might cut his feet and legs if he broke the window. Johnson demanded to speak with the sergeant.

Sergeant Deras came to the vehicle to speak with Johnson. He instructed Johnson to calm down, but Johnson did not. Sergeant Deras told him he would not speak with him because he was not calm. Johnson thrashed around inside the vehicle and kicked at the windows, which caused the vehicle to rock. He managed to snap a screw that held a security bar in place. Sergeant Deras wasn't sure whether Johnson was trying to vandalize the vehicle or injure himself, but he could have done both. Deras determined that the WRAP device needed to be applied to protect the police vehicle and to protect Johnson from injuring himself.[1]

Deras asked Johnson to get out of the vehicle. Johnson did not comply, so the officers physically removed him. During that time, Johnson was thrashing and fighting with the officers, as well as cursing and screaming at them. He spit bloody spit on them. A spit mask was placed over his face after at least three attempts.[2] He tried to bite an officer, and jerked about to resist efforts to apply the spit mask. Two officers struck Johnson in an attempt to gain compliance. While Johnson was still struggling, officer Guerin tased Johnson, and the WRAP device was finally secured. It took the five officers about 15 minutes to subdue him and apply the WRAP. Even after he was in the WRAP device, he violently slammed his torso into officer Matsuhara and grabbed Matsuhara's ankle. Matsuhara applied a distraction blow to prevent Johnson from continued efforts to assault him.

---

[1] Deras described the WRAP device in his declaration. Deras Decl., pp. 3-4. The WRAP device is put on a handcuffed person and consists of an ankle strap, upper body harness, a leg restraint. Once the WRAP device is properly applied, the subject will be in a seated position, with his legs straight in front of him, and his hands cuffed behind his back.

[2] Deras described the spit mask in his declaration. Deras Decl., pp. 4, 5. The spit mask is made of light mesh with a soft cloth around the lower portion. It does not impede the subject's vision or breathing but prevents his spit from traveling more than a couple of inches from his mouth.

4

On June 24, 2010, Johnson pled no contest to charges of battery on a peace officer (Cal. Penal Code § 243(b)), threatening a peace officer (Cal. Penal Code § 69), and making terrorist threats (Cal. Penal Code § 422). He was sentenced to a prison term.

**VENUE AND JURISDICTION**

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to Johnson's complaint occurred in Monterey County, located in the Northern District. See 28 U.S.C. §§ 84, 1391(b). This Court has federal question jurisdiction over this action under 42 U.S.C. § 1983. See 28 U.S.C. § 1331.

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Generally, as is the situation with defendants' challenge to the Fourth Amendment claim, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted).

5

1    Where, as is the situation with defendants' qualified immunity defense, the moving party
2 bears the burden of proof at trial, he must come forward with evidence which would entitle him
3 to a directed verdict if the evidence went uncontroverted at trial. See Houghton v. Smith, 965
4 F.2d 1532, 1536 (9th Cir. 1992). He must establish the absence of a genuine issue of fact on
5 each issue material to his affirmative defense. Id. at 1537; see also Anderson v. Liberty Lobby,
6 Inc., 477 U.S. at 248. When the defendant-movant has come forward with this evidence, the
7 burden shifts to the non-movant to set forth specific facts showing the existence of a genuine
8 issue of fact on the defense.

9    A verified complaint may be used as an opposing affidavit under Rule 56, as long as it
10 is based on personal knowledge and sets forth specific facts admissible in evidence. See
11 Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's
12 verified complaint as opposing affidavit where, even though verification not in conformity with
13 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct,
14 and allegations were not based purely on his belief but on his personal knowledge). Here, the
15 complaint was verified, and therefore is considered as evidence for purposes of deciding the
16 motion.[3]

17    The court's function on a summary judgment motion is not to make credibility
18 determinations nor to weigh conflicting evidence with respect to a disputed material fact. See
19 T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). The
20 evidence must be viewed in the light most favorable to the nonmoving party, and the inferences
21 to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. Id.
22 at 631.

---

[3] Johnson's complaint, however, has only a very brief description of the incident and omits any mention of what Johnson was doing when defendants used force on him, other than to state that he had handcuffs on him at the time force was used on him. With the liberal construction that is required for pro se pleading, his allegations were sufficient to state a claim, but liberal construction does not work as a substitute for actual evidence when the case has progressed to the summary judgment stage.

**DISCUSSION**

A.  Heck

Defendants argue that Johnson's criminal convictions stemming from the incident require that his action be dismissed under the rule from Heck v. Humphrey, 512 U.S. 477 (1994). Heck held that, in order to recover damages for an allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed or otherwise set aside or called into question. Id. at 486-87.

There are two problems with the Heck argument. First, the record is not sufficiently developed for the court to make the Heck determination. The record here is limited to court minutes from proceedings in which Johnson entered a no-contest plea and was sentenced. From those two documents, the court cannot determine the factual basis for either conviction, and therefore cannot determine that they are incompatible with success on the excessive force claim. For example, a conviction under California Penal Code § 69 may be based on verbal threats or physical violence to deter an officer. It is not at all clear that a conviction based on verbal threats would be inconsistent with an excessive force claim. Thus, it cannot be said that the conviction would be called into question by success on the § 1983 claim.

Second, the recent case of Hooper v. County of San Diego, No. 09-55954, slip op. 349, 362-63 (9th Cir. Jan. 4, 2011), held that a § 1983 claim for excessive force used during the course of an arrest was not barred by Heck based on the plaintiff's conviction for resisting that arrest. Although Hooper concerned a conviction under California Penal Code § 148(a)(1), the reasoning of the case leads this court to doubt that Johnson's convictions under California Penal Code § 69 and § 243 would pose a Heck bar to his excessive force claim. (Defendants are not faulted for not addressing this point because Hooper was issued long after they filed their motion.) The court does not decide the legal question because the record is insufficient to make such a decision.

7

B.     Excessive Force Claim

The constitutional right at issue when it is alleged that a law enforcement officer used excessive force in the course of an arrest or other seizure is the Fourth Amendment right to be free from "unreasonable . . . seizures." U.S. Const. amend. IV; see Graham v. Connor, 490 U.S. 386, 394 (1989). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Id. at 396 (citations and internal quotation marks omitted). Because the reasonableness standard is not capable of precise definition or mechanical application, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. Courts also consider the "quantum of force used to arrest the plaintiff, [citation], the availability of alternative methods of capturing or detaining the suspect, [citation], and the plaintiff's mental and emotional state [citation]." Luchtel v. Hagemann, 623 F.3d 975, 980 (9th Cir. 2010).

The reasonableness inquiry in excessive force cases is an objective one, the question being whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation and without the "20/20 vision of hindsight." Graham, 490 U.S. at 396. This analysis applies to any arrest situation where force is used, whether it involves physical restraint, use of a baton, use of a gun, or use of a dog. Mendoza v. Block, 27 F.3d 1357, 1362 (9th Cir. 1994).

Defendants acknowledge that they did use force on Johnson and did so while he was in handcuffs, but describe it as a measured response to a physically resisting arrestee. Under the totality of circumstances, and viewing the evidence in the light most favorable to Johnson, the defendants' use of force – pushing Johnson into the police vehicle, striking him about ten times, and tasing him once -- in arresting him was reasonable. Considering the various factors identified by Graham, the court concludes as a matter of law that the force used was not

excessive.

Severity of the crime: Johnson's offense was not particularly serious. Johnson was arrested because he was in violation of a parole condition that required him not to be in contact with Wanda.

Immediacy of threat to the safety of officers or others: Although he was in handcuffs, Johnson posed an immediate threat to the safety of the officers. When he was partially in the vehicle, he was trying to kick officer Cortez in the abdomen and groin. Had he succeeded in disabling officer Cortez with one of his kicks, he also would have posed a danger to officer Mora, who was much smaller than Johnson. Johnson also posed a danger to the officers when they were trying to put the WRAP device and spit mask on him, as he thrashed about and spit at them. And Johnson threw his body weight at and grabbed at officer Matsuhara's ankle even after the WRAP device had mostly immobilized him. He also was trying to do property damage to the police vehicle.

Active resistance to arrest: The undisputed evidence shows that Johnson was actively resisting efforts to complete the arrest and transport him to the police department.

Quantum of force used: The force used consisted of Johnson being pushed into the vehicle, being struck by the hand of several different officers approximately ten times, and being tased once. This force was used during a 15-20 minute period.[4] Officer Cortez shoved Johnson against the vehicle to handcuff him, but Johnson did not contend this was excessive; it does not appear the shove caused any injury or was constitutionally significant. After Johnson was handcuffed, officer Cortez pushed Johnson into the back seat area of the police vehicle, but only after he refused repeated commands to get into the vehicle. Officer Cortez struck Johnson twice and Mora struck him four times, but only after he refused their repeated commands to get all the way into the police vehicle and continued to thrash about and was trying to kick Cortez. Once he got all the way into the police vehicle (upon being informed that he would be tased if he did

---

[4] Johnson stated in his complaint that the events took 20 minutes, and defendants state that the events took about 15 minutes. The 5-minute difference is not material; the important point is that this was prolonged resistance by an arrestee.

9

not) and the doors were shut, Johnson began screaming and kicking at the window with his bare foot. Sergeant Deras was uncertain whether Johnson was trying to inflict property damage or to injure himself, but both were possible, and Deras decided that Johnson needed to be immobilized with the police department's WRAP device. When Johnson was asked to get out of the vehicle, he refused, and was physically removed. He continued thrashing and fighting with the officers, as well as spewing bloody spit on them. Two officers struck Johnson in an attempt to gain compliance with their orders, and officer Guerin used the taser once on Johnson so that the WRAP device and a spit mask could be put on him. Johnson suffered some abrasions during the scuffle when they put the WRAP device on him. Even after Johnson was in the WRAP device, he continued resisting, as he slammed his immobilized torso at officer Matsuhara and grabbed at Matsuhara's ankle. Matsuhara then struck Johnson to prevent continued assaultive efforts by Johnson. Each time Johnson was struck by a defendant, he was violently struggling against defendants' efforts to get him completely into the vehicle or violently struggling against defendants' efforts to put restraining devices on him.

Injuries: The evidence of any injuries is weak: Johnson alleged a variety of ailments in his complaint, but provided no medical records in support of his assertions and provided no evidence that the injuries stemmed from any particular defendant's actions as opposed to his violent efforts to resist the deputies. See Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 922 (9th Cir. 2001) (allegations of injury without medical records or other evidence of injury insufficient to establish excessive force claim under 4th Amendment).

Efforts to temper use of force: The police officers attempted to temper the severity of their response by giving Johnson numerous oral commands to stop fighting and to comply with their orders to settle down before using force on him. No force was used that was not preceded by and responsive to Johnson's resistant behavior.

One might argue that there are alternative ways to deal with an arrestee thrashing around in the back of a police vehicle. But that kind of leisurely second-guessing ignores the directive to analyze the force making "allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about

1   the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397.  Doing
2   so, this court concludes that no reasonable jury could find that defendants applied an excessive
3   amount of force during the arrest of Johnson.  See, e.g., Brooks v. City of Seattle, 599 F.3d 1018,
4   1030-31 (9th Cir. 2010) (officers entitled to judgment in case presenting a less-than-intermediate
5   use of force (i.e., tasing a pregnant woman three times), which was "prefaced by warnings and
6   other attempts to obtain compliance, against a suspect accused of a minor crime, but actively
7   resisting arrest, out of police control, and posing some slight threat to officers"); Drummond v.
8   City of Anaheim, 343 F.3d 1052, 1058-60 (9th Cir. 2003) (although some force was justified in
9   restraining mentally ill individual so he could not injure himself or the officers, once he was
10  handcuffed and lying on the ground without offering resistance, two officers who knelt on him
11  pressed their weight against his torso and neck despite his pleas for air used constitutionally
12  excessive force); Miller v. Clark County, 340 F.3d 959, 963-68 (9th Cir. 2003) (use of trained
13  police dog to "bite and hold" suspect until officers arrived on the scene less than a minute later
14  does not constitute unreasonable excessive force under 4th Amendment when suspect poses
15  immediate threat to officers' safety, several attempts to arrest suspect with less forceful means
16  are unsuccessful as a result of suspect's defiance, and use of police dog is well-suited to task of
17  safely arresting suspect).  Johnson has failed to establish a triable issue of fact as to whether he
18  was subjected to excessive force by defendants.  Defendants are entitled to judgment as a matter
19  of law on the Fourth Amendment claim.

21  C.     Qualified Immunity
22         The defense of qualified immunity protects "government officials . . . from liability for
23  civil damages insofar as their conduct does not violate clearly established statutory or
24  constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald,
25  457 U.S. 800, 818 (1982).  In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court set forth
26  a two-pronged test to determine whether qualified immunity exists.  The threshold question is:
27  "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the
28  officer's conduct violated a constitutional right?"  Id. at 201.  If no constitutional right was

violated if the facts were as alleged, the inquiry ends and defendants prevail. See id. If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. . . . 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 201-02 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Although Saucier required courts to address the questions in the particular sequence set out above, courts now have the discretion to decide which prong to address first, in light of the particular circumstances of each case. See Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).

As shown in the preceding section, the evidence in the record does not establish a violation of Johnson's Fourth Amendment rights. Defendants prevail on the first step of the Saucier analysis, so the court need not proceed to the second step of the Saucier analysis. Defendants are entitled to judgment as a matter of law on the qualified immunity defense.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED. (Docket # 11.) Defendants are entitled to judgment as a matter of law on the merits of the Fourth Amendment claim and on their defense of qualified immunity. Judgment will be entered in all defendants' favor and against plaintiff. The clerk will close the file.

IT IS SO ORDERED.

Dated: February 4, 2011

_____
SUSAN ILLSTON
United States District Judge